*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 09, 2026
9:30 AM

Plaintiff-Appellee,

v

No. 368043
Van Buren Circuit Court
LC No. 2022-024165-FC

JUAN LUIS SOLIS-REYNA,

Defendant-Appellant.

Before: WALLACE, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his conviction of second-degree murder, MCL 750.317. The trial court sentenced defendant to serve 25 to 50 years' imprisonment.[1] We affirm defendant's conviction and sentence.

## I. UNDERLYING FACTS

This case arises from the murder of Jose Cruz Armijo (the victim) that occurred over three decades ago on or about April 24, 1995.

On April 23, 1995, defendant, the victim, Abraham Solis, Porfirio Solis, Tomas Solis, and Edmundo Solis[2] all met after work and went to a bar where they stayed and drank until the bar closed at 2:00 a.m. While they were at the bar, Dimas Alonzo and his friend "Roy" joined the

---

[1] Defendant was also convicted of possession of a firearm during the commission of a felony, MCL 750.227b(1), for which he received two-year term of imprisonment to be served consecutive to and preceding term of imprisonment for the underlying felony. However, he does not now contest that conviction or sentence.

[2] Abraham, Porfirio, and Tomas are all brothers, and Edmundo and defendant are their cousins. The victim was the brother-in-law of Abraham, Porfirio, and Tomas. The record does not clearly describe the relationship between defendant and the victim; however, in defendant's sentencing memorandum, defendant described the victim as his "best friend."

-1-

group. After the bar closed, the group, including Dimas and Roy, went to defendant's house and continued their night of drinking. While they were at his house, defendant had a handgun and fired several shots into the air and at his house. He also fired a shot at Dimas's car, causing a flat tire.

After defendant shot out the tire of his car, Dimas decided to leave. Accompanied by Roy, Dimas then drove off with the flat tire. Shortly afterwards, the victim left the premises and began walking home. The remaining group, Abraham, Porfirio, Tomas, Edmundo, and defendant subsequently left together in Abraham's van, with defendant still in possession of the handgun. While driving, they passed the victim, told him the walk home was too far, and convinced him to get into the van so that they could drive him home.

At some point while they were driving, defendant told the victim that he was going to kill him, and the victim laughed. Defendant then said, "[Y]ou don't believe it," and the victim laughed again. Defendant then shot the victim in the head.

The driver of the van, Porfirio, was told by defendant to stop so that he could "throw out the body." When Porfirio refused, defendant threatened him with the gun. The group then drove to a gravel area by a vineyard, and defendant and Edmundo threw the victim's body out of the van. After dumping the body, defendant told them not to tell anyone what happened. The group then dispersed. Defendant went back to his house and told his wife that he had to leave, but did not tell her where he was going.

After Abraham returned home, he told his father and Maria Juarez, his sister-in-law, what had happened. Juarez, who spoke English, called the police. At approximately 6:30 a.m. on April 24, 1995, the police met Juarez and Abraham, and then followed them to the location of the victim's body. The police noticed there appeared to be blood on the rear passenger window of the van that Juarez and Abraham arrived in, as well as blood coming out of the bottom of the frame. The police secured the van as evidence, and it was later identified as the same van in which the victim was shot. The police also determined that the victim was dead; however, his body was still warm. The victim died as a result of the single gunshot wound to his head; the bullet entered through the left side of the victim's forehead, passed through his brain, and exited from the back top right of his scalp.

After speaking with Abraham and Juarez, the police also went to defendant's house and spoke with defendant's wife, defendant having already departed. While at defendant's house, the police discovered six spent .357 shell casings and two live .357 rounds in front of the house. They recovered an additional bullet, which was either .357 or .38 caliber, from behind the rear seat of the van. In subsequently executing a search warrant, the police recovered a jacket with what appeared to be blood on it, as well as two more spent shell casings from a dumpster behind defendant's house. The murder weapon was never recovered.

The police also talked to a man named Juan Perez. They learned that defendant had gotten a yellow van from Perez earlier that morning.[3] The police then obtained a warrant for defendant's

---

[3] As later detailed in this opinion, testimony from Perez suggests that defendant coerced him to let him take the van, but defendant was not charged with anything related to Perez or the van.

arrest for open murder that same day, i.e., April 24, 1995. Eleven days later, the yellow van was found in Missouri.

From April 24, 1995 until November 2018, various law enforcement agencies were unable to locate defendant. The authorities discovered that defendant was in Mexico in 2018 after he reached out to his wife via Facebook. In May 2022, the Mexican authorities arrested defendant, who was then extradited to the United States in September 2022.

In July 2023, defendant was tried for the murder of the victim. Abraham, Porfirio, and Tomas all testified similarly regarding the events of the night of the victim's death. Dimas testified similarly to Abraham, Porfirio, and Tomas regarding the events at the bar and defendant's house; however, he also gave additional details of his interactions with defendant the night of the murder. Specifically, Dimas testified that, when he met defendant at the bar, he and defendant played two games of pool, which defendant lost. Dimas testified that, after defendant lost the second game, defendant pulled a knife on him and forced him to play a third game. Dimas also testified that later in the night at defendant's house, defendant fired six shots right in front of him, and then started reloading the gun in front of Dimas. When Dimas indicated he was leaving, defendant told Dimas that he was not going anywhere; defendant then shot his tire.

Perez testified that when defendant asked for the van, defendant said "not to tell him no" and that he had just killed someone. The police testified that all the shell casings recovered from defendant's house had to have been fired from the same gun, but the exact gun was not known. Further, the police testified that the bullet recovered from the van and live rounds that were recovered were also consistent with the type of gun that the casings were from. The medical examiner testified that the gun would have been fired between 6 inches and 4 feet from the victim's head. The medical examiner also testified that, although suicide was a possible manner of death, he ruled out suicide because, in his experience, it was unusual for someone to take their own life with a gun while holding it away from their head.

Defendant then testified in his own defense. Throughout his testimony, defendant repeatedly emphasized how drunk he was that night and that there were a lot of things that he did not remember; however, he remembered that he did not shoot the victim. On cross-examination, defendant admitted that he voluntarily drank alcohol that night and that he never tried to contact law enforcement.

Defense counsel then informed the trial court that defendant wanted a voluntary manslaughter instruction. On the record, the trial court confirmed with defendant that he wanted a voluntary manslaughter instruction, and it also confirmed that he understood the significance of such an instruction. The trial court then denied the request, determining that it was not supported by a rational view of the evidence because the victim laughing at defendant was not adequate provocation. The trial court instructed the jury without further objection. The jury found defendant guilty of second-degree murder.

At the sentencing hearing, the trial court adopted a minimum sentencing guidelines range of 96 to 300 months without objection from either party. The trial court then sentenced defendant at the top of the guidelines range to 25 to 50 years' imprisonment. In support of its sentence, the court detailed how the sentence considered punishment, protection, rehabilitation, and deterrence,

as well as how the sentence was proportionate to the circumstances of defendant and the sentencing offense.

In July 2024, defendant moved for a new trial in the trial court, arguing that defense counsel was ineffective because he failed to object to the admission of Dimas's testimony regarding the knife incident at the bar and the shooting at defendant's house. Defendant also argued that Dimas's testimony regarding the two incidents should have been excluded under MRE 404(b). The trial court denied defendant's motion for a new trial. In relevant part, the trial court determined that the other-acts evidence was admissible pursuant to MRE 404(b) and that the prosecution's failure to comply with the notice requirement did not substantially affect the outcome of the trial. Further, it determined that defense counsel was not ineffective because defendant failed to demonstrate that the failure to object to the admission of the other-acts evidence was prejudicial.

Defendant now appeals.[4]

## II. LEGAL ANALYSIS

On appeal, defendant argues that his conviction should be vacated because the trial court erred when it allowed the prosecution to introduce inadmissible, unfairly prejudicial other-acts evidence without proper notice. Defendant also argues that his conviction should be vacated because he was denied effective assistance of counsel when defense counsel failed to request an involuntary manslaughter instruction and failed to object to the admission of the improper other-acts evidence. Lastly, defendant argues that his sentence should be vacated because it is disproportionate.

## A. OTHER-ACTS EVIDENCE

First, defendant argues that the trial court plainly erred when it admitted improperly noticed and unfairly prejudicial other-acts evidence such that a new trial is warranted. We disagree.

"Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights." *People v Brown*, 326 Mich App 185, 195; 926 NW2d 879 (2019) (quotation marks and citation omitted). Under plain-error review, a defendant must demonstrate that (1) an error occurred, (2) that the error was clear or obvious, and (3) that the error affected substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). If these requirements are satisfied, an appellate court exercises its discretion regarding whether to reverse, with reversal only being warranted when the error "resulted in the conviction of an actually innocent defendant or when an error that seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and citation omitted; alteration in original).

---

[4] In December 2024, defendant moved to remand for a *Ginther* hearing. *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). This Court denied defendant's motion to remand, without prejudice. *People v Solis-Reyna*, unpublished order of the Court of Appeals, entered February 5, 2025 (Docket No. 368043).

Defendant contests the admission of Dimas's testimony regarding two incidents that occurred the same night as the murder. Specifically, defendant contests Dimas's testimony about how defendant allegedly pulled a knife on Dimas after losing two games of pool (the knife incident), and defendant contests Dimas's testimony about how defendant shot and reloaded a gun in front of Dimas at defendant's house (the gun incident).

At the time of trial, MRE 404(b) provided as follows:

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

(2) The prosecution in a criminal case shall provide written notice at least 14 days in advance of trial, or orally on the record later if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial and the rationale, whether or not mentioned in subparagraph (b)(1), for admitting the evidence. If necessary to a determination of the admissibility of the evidence under this rule, the defendant shall be required to state the theory or theories of defense, limited only by the defendant's privilege against self-incrimination.[5]

Before evidence of other crimes, acts, or wrongs may be admitted, the evidence must pass a four-part test as established by our Supreme Court in *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). See *People v Sabin (After Remand)*, 463 Mich 43, 55-56; 614 NW2d 888 (2000). The test is as follows: (1) the evidence must be "offered for a proper purpose under MRE 404(b)"; (2) the evidence must be relevant; (3) the evidence's probative value cannot be substantially outweighed by the danger unfair prejudice; and (4) "the trial court may, upon request, provide a limiting instruction to the jury." *VanderVliet*, 444 Mich at 55.

First, the prosecutor must have articulated "a proper noncharacter purpose for admission" of the other-acts evidence. *Id*. at 385. But "[e]vidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on defendant's character." *People v Mardlin*, 487 Mich 609, 615; 790 NW2d 607 (2010). The admission of the evidence of the two incidents could have been offered to prove: motive, intent, preparation, opportunity, identity, and state of mind. Each of these theories are proper noncharacter purposes that support admission under

---

[5] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxviii (2023). We rely on the version the rules in effect at the time this issue was decided at trial in July 2023.

MRE 404(b)(1). Accordingly, because the other-acts evidence could have been offered for several proper noncharacter purposes, the first part of the *VanderVliet* test is satisfied.

"[L]ogical relevance," i.e., the second part of the *VanderVliet* test is "the 'touchstone' of the admissibility of other-acts evidence." *People v Denson*, 500 Mich 385, 401; 902 NW2d 306 (2017). "Other-acts evidence is logically relevant if two components are present: materiality and probative value." *Id*. Materiality requires that the "evidence be related to any fact that is of consequence to the action." *Id*. (quotation marks and citation omitted). A fact is "of consequence to the action" if it is "directed at an element of the crime or an applicable defense" or if it "is 'in issue' in the sense that it is within the range of litigated matters in controversy." *Sabin*, 463 Mich at 57 (quotation marks and citations omitted). "[A]ll elements of a criminal offense are 'in issue' when a defendant enters a plea of not guilty." *People v Mills*, 450 Mich 61, 69; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995).

In the present case, defendant denied that he shot and killed the victim, arguing that the victim could have shot and killed himself. Both the knife incident and the gun incident rebut defendant's argument that he did not shoot and kill the victim. For example, the knife incident demonstrates defendant's motive for killing the victim and his state of mind at the time of the incident. Prior to the knife incident, defendant lost two games of pool to Dimas. Defendant's refusal to play a third game motivated defendant to pull a knife on Dimas, i.e., the embarrassment of having failed to beat Dimas at pool motivated defendant to pull a knife on him. Likewise, the testimony at trial reflects the victim laughing in response to defendant saying he would kill him caused him to respond, ""[Y]ou don't believe it," whereupon the victim laughed again, and being laughed at and "called out" in this manner and the resulting embarrassment may have likewise motivated defendant to shoot. Thus, the knife incident is related to a fact of consequence.

The gun incident likewise demonstrates defendant's motive and state of mind. Dimas' negative reaction to defendant firing the gun, i.e., Dimas indicating that he was going to leave because of what defendant did, motivated defendant to shoot out Dimas' tire. Thus, later in the night, when the victim laughed at defendant, the gun incident is also relevant as evidence that, on the night of the incident, defendant was motivated to react with a weapon upon the most casual slight. Proof of motive is relevant to prove murder. *People v Caddell*, 332 Mich App 27, 58; 955 NW2d 488 (2020).

Further, the gun incident demonstrates defendant's identity, i.e., he was the only person who possessed a gun during the night of the incident. In other words, the evidence suggests that he is the person who had a gun at the time of the incident. That evidence, under MRE 401, has a tendency to make it more likely that defendant was the person who shot the victim. Likewise, the gun incident demonstrates defendant's opportunity to shoot the victim. Dimas' testimony is that defendant both fired the gun and reloaded it, thereby establishing that defendant knew how to operate the revolver and that it was loaded. Therefore, the gun incident is also related to a fact of consequence.

Because of the above, Dimas's testimony regarding the two incidents is also material because it rebuts defendant's argument that Abraham, Porfirio, and Tomas fabricated their testimonies and falsely accused defendant of shooting and killing the victim. See *Mardlin*, 487 Mich at 624; *People v Starr*, 457 Mich 490, 501-502; 577 NW2d 673 (1998).

The other-acts evidence must also have probative value. "Evidence is probative if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Denson*, 500 Mich at 401-402 (quotation marks and citations omitted). "In the context of prior acts evidence, however, MRE 404(b) stands as a sentinel at the gate: the proffered evidence truly must be probative of something *other* than the defendant's propensity to commit the crime." *Id*. at 402 (quotation marks and citation omitted). At the time of trial, MRE 401 stated that " 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In the present case, Dimas's testimony regarding both incidents was probative of defendant's state of mind, at the very least. "[O]ther acts evidence is especially pertinent where the trial court determines that the issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *VanderVliet*, 444 Mich at 85 (quotation marks and citation omitted). A defendant's state of mind is at issue when a defendant is charged with murder because the prosecution must prove that defendant acted with a culpable mental state. See *People v Mendoza*, 468 Mich 527, 540; 664 NW2d 685 (2003); *VanderVliet*, 444 Mich at 70-71.

As discussed earlier, defendant denies shooting and killing the victim and implicitly denies intentionally shooting and killing the victim because of his intoxicated state. Accordingly, defendant's state of mind was at issue, and there was no other evidence presented that established defendant's state of mind, especially considering that the witnesses that testified never observed any fighting or disagreements between defendant and the victim before the victim's death.

Therefore, Dimas's testimony regarding defendant's earlier conduct on the night of the incident both at the bar and at defendant's house is probative of defendant's state of mind because it demonstrates he reacted with disproportionate violence at different times during the night of the victim's murder whenever someone did of said something that appeared to have displeased him. Further, because defendant's conduct the night of the victim's death suggests that he had a violent state of mind, Dimas's testimony as to both incidents makes it more likely that defendant had a similar state of mind when the victim was killed, thereby making it more likely that defendant intentionally acted violently and was the one who shot and killed the victim. See *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). Also, Dimas's testimony regarding defendant's earlier conduct that night is probative evidence that defendant shot and killed the victim because defendant was the only person that night who reacted with violence when drunk. In other words, the evidence of the two incidents did not suggest that defendant had a general character trait of violence, rather that he had the specific state of mind as established by his actions toward Dimas that night.

In addition, Dimas's testimony regarding the gun incident made it less likely that Abraham, Porfirio, and Tomas fabricated their testimonies or falsely accused defendant. At trial, defendant emphasized that Abraham, Porfirio, and Tomas were all brothers and the fact that their testimonies were so similar indicated that they were fabricated. However, Dimas's gun incident testimony corroborated several parts of the brothers' testimonies. Specifically, Dimas, Abraham, Porfirio, and Tomas all testified that defendant shot the gun more than once at defendant's house and that defendant shot out the tire of Dimas's car. Dimas is unrelated to both defendant and the brothers,

so he does not have the same alleged motivation to lie. Further, the fact that Dimas corroborated parts of the brothers' testimonies detailing the gun incident makes it less likely that the brothers fabricated other parts of their testimonies. Dimas was the only other witness available to testify about the events leading up the victim's death other than the testimony of the brothers; therefore, without Dimas's testimony of the gun incident just before the victim's death, the prosecution would not be able to effectively rebut defendant's claim that the brothers' testimonies were fabricated. See *Starr*, 457 Mich at 501-502. Accordingly, the testimony of the gun incident is logically relevant to rebut defendant's claim that the brothers fabricated their testimonies.

The knife incident is also probative of defendant's motive, namely, that defendant acted with disproportionate violence because he was likely embarrassed or belittled by the victim. As explained earlier, Dimas testified that defendant pulled a knife on him after Dimas had defeated defendant in two games of pool, and defendant was angry. Then later in the van, Abraham, Porfirio, and Tomas all testified that defendant shot the victim after the victim laughed at defendant when defendant said that he was going to kill him, and after the victim laughed a second time when defendant said, "[Y]ou don't believe it." Defendant's angry and violent reaction to losing a couple of games of pool is probative of his motive to kill the victim because the victim embarrassed or belittled him by laughing at defendant's threat to kill him. Further, motive is generally relevant to prove murder. *Caddell*, 332 Mich App at 58. Accordingly, the knife incident is logically relevant to prove that defendant shot and killed the victim.

In sum, the evidence of the two incidents was offered for several proper purposes under MRE 404(b) and the evidence was relevant, i.e., probative of several facts of consequence.

Third, the probative value of the other-acts evidence must not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Mardlin*, 487 Mich 627 (quotation marks and citation omitted). "The trial court is in the best position to make MRE 403 determinations on the basis of a contemporaneous assessment of the presentation, credibility, and effect of testimony . . . ." *Id*. at 627 (quotation marks and citation omitted).

As discussed earlier, both incidents are probative of defendant's state of mind, the gun incident is also relevant to rebutting defendant's claim that witnesses fabricated their testimonies, and both incidents are also probative of defendant's motive. Therefore, both incidents have probative value, and that value must be *substantially* outweighed.

> Assessing probative value against prejudicial effect requires a balancing of several factors, including the time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. [*People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).]

In the present case, the testimony of both incidents was brief and was presented by a witness that was called regardless because he was with defendant for part of the night of the victim's death. Therefore, it did not take an undue amount of time and caused no meaningful delay in the proceedings. The evidence was also not needlessly cumulative and was necessary for rebutting defendant's claims that the brothers' fabricated their testimonies, and that defendant did not shoot and kill the victim. There was also little potential for confusing or misleading the jury because Dimas's testimony did not involve the victim in the present case.

Further, the evidence was presented in a way that minimized harmful collateral effects because it was brief, and there was no indication to the jury that defendant was convicted or charged with either of the other acts. Also, the testimony did not contain any facts that were more inflammatory than what was already testified about by Abraham, Porfirio, and Tomas. See *People v Railer*, 288 Mich App 213, 220; 792 NW2d 776 (2010). Specifically, the brothers testified that defendant shot and killed the victim after telling the victim that he was going to kill him, and the brothers testified that defendant threatened them with a gun when trying to get them to dump the body. On the other hand, Dimas testified that defendant pulled a knife, shot and reloaded a gun in front of Dimas, and shot out his tire. Neither of those incidents involved defendant threatening to kill or physically harm Dimas. Accordingly, these factors do not suggest that the probative value of either incident was substantially outweighed by unfair prejudice.

The last part of the *VanderVliet* test provides that a trial court "may, upon request, provide a limiting instruction to the jury." *VanderVliet*, 444 Mich at 55. In the present case, there was no request for a limiting instruction. Regardless, the trial court "may," but is not obligated to, provide a limiting instruction upon request. *Id*.

In sum, the other-acts evidence was probative of several proper noncharacter purposes that were at issue in the present case, and any prejudice caused by the admission of the evidence did not substantially outweigh its probative value because it was unlikely to confuse or mislead the jury, took little time, and was not any more inflammatory than the facts of the present case. Therefore, the other-acts evidence, i.e., both incidents, was substantively admissible under MRE 404(b).

However, the prosecution failed to give "pretrial notice of its intent to introduce other acts evidence at trial" as required by MRE 404(b). *People v Jackson*, 498 Mich 246, 260-261; 869 NW2d 253 (2015) (quotation marks and citation omitted). Therefore, we conclude that the trial court did plainly err when it admitted the other-acts evidence without reference to, or compliance with, MRE 404(b). See *id*. at 276. However, defendant is not entitled to relief because this was not "plain error," i.e., it did not affect defendant's substantial rights.

This error did not result in the introduction of inadmissible other-acts evidence. As discussed earlier, the other-acts evidence was substantively admissible under MRE 404(b). Further, the record indicates that defendant did know about Dimas's testimony in advance because Dimas testified about both the knife incident and the gun incident at defendant's preliminary examination, and the prosecution properly notified defendant of its intent to present Dimas as a witness at trial. Therefore, defendant did not suffer "unfair surprise" from the introduction of this testimony at trial. *Jackson*, 498 Mich at 261. Accordingly, the error of admitting Dimas's testimony of the knife incident and gun incident did not seriously affect "the fairness, integrity, or

public reputation of judicial proceedings." *People v Butsinas*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 364778); slip op at 12 (quotation marks, citations, and brackets omitted).

Also, even without Dimas's testimony, the other evidence of defendant's guilt was overwhelming. Defendant himself admitted that he brought the gun into the van and that he had fired the gun at least twice while at his house, including at Dimas's tire. These facts were also corroborated by Abraham, Porfirio, and Tomas's testimonies, as well as by the shell casings found by the police at defendant's house. Further, the three witnesses who were in the van when defendant shot the victim testified consistently with each other, and none of them indicated any doubt that defendant shot the victim. The blood found in the van was consistent with the witnesses' testimonies regarding where the victim was sitting when he was shot. Further, there was expert testimony that the bullet found in the van likely came from the same gun that produced the shell casings at defendant's house. Additionally, one of the witnesses also reported the shooting to the police very soon after it occurred, and the police found a bloody jacket and two rounds of ammunition in defendant's dumpster behind his house. Another witness, Perez, testified that when defendant came to take his van, defendant told him that he had killed someone the previous night. Lastly, defendant left his wife and children behind and fled to Mexico the morning after the murder, and he stayed in Mexico until he was arrested and extradited to the United States over two decades later. See *Unger*, 278 Mich App at 226 (finding one can infer guilt from evidence of flight).

Lastly, there was not a substantial risk that the other-acts evidence was used only as character evidence. "[O]ther acts evidence carries with it a high risk of confusion and misuse. When a defendant's subjective character [is used] as proof of conduct on a particular occasion, there is a substantial danger that the jury will overestimate the probative value of the evidence." *People v Felton*, 326 Mich App 412, 431; 928 NW2d 307 (2018) (quotation marks and citation omitted; second alteration in original).

> [Character evidence] presents three types of impropriety. First, that jurors may determine that although defendant's guilt in the case before them is in doubt, he is a bad man and should therefore be punished. Second, the character evidence may lead the jury to lower the burden of proof against the defendant, since, even if the guilty verdict is incorrect, no "innocent" man will be forced to endure punishment. Third, the jury may determine that on the basis of his prior actions, the defendant has a propensity to commit crimes, and therefore he probably is guilty of the crime with which he is charged. All three of these dimensions suggest a likelihood that innocent persons may be convicted. [*Id*., quoting *People v Allen*, 429 Mich 558, 569; 420 NW2d 499 (1988).]

The other-acts evidence in the present case does not present these same risks of impropriety because defendant was not convicted, or charged, for these other-acts. Therefore, the jury would have had no reason to conclude that defendant was a convicted criminal and therefore was not innocent or that he had the propensity to commit crimes. Further, as discussed earlier, Dimas's testimony of these other acts was just one small part of the evidence presented against defendant. In fact, other than Dimas's brief recounting of the events, the prosecution did not emphasize the two incidents in its opening or closing arguments. Accordingly, there was not any "substantial risk" posed by this other-acts evidence.

-10-

In sum, any error of admitting Dimas's testimony of the knife incident and gun incident did not result in the conviction of an actually innocent defendant. Accordingly, defendant is not entitled to appellate relief.

## B. EFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues that defense counsel was ineffective for two reasons: (1) defense counsel failed to request an involuntary manslaughter instruction, and (2) defense counsel failed to object to the admission of the other-acts evidence. We disagree.

An ineffective assistance of counsel claim presents "a mixed question of fact and constitutional law." *People v White*, 331 Mich App 144, 150; 951 NW2d 106 (2020) (quotation marks and citation omitted). Findings of fact are reviewed for clear error, but constitutional questions are reviewed de novo. *Id.* However, when an evidentiary hearing is not held, our review is limited to "errors apparent on the record." *People v Spaulding*, 332 Mich App 638, 656; 957 NW2d 843 (2020).

Both the United States and Michigan Constitutions entitle a criminal defendant to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. See also *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023). To establish ineffective assistance of counsel, defendant has the burden of establishing that "(1) that counsel's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *White*, 331 Mich App at 149 (quotation marks and citations omitted). "Effective assistance of counsel is presumed, and the defendant bears the heavy burden of proving otherwise." *People v Lockett*, 295 Mich App 165, 187; 814 NW 2d 295 (2012).

"Defense counsel is not ineffective for failing to request a jury instruction if there was insufficient evidence that the jury instruction would apply to the defendant's case." *People v Geary*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371889); slip op at 3.

In the present case, defendant was convicted of one count of second-degree murder. The elements of second-degree murder are: "(1) death, (2) caused by the defendant, (3) with malice, and (4) without justification or excuse." *People v Spears*, 346 Mich App 494, 514; 13 NW3d 20 (2023). Malice may be established "by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022). "Malice is implied when the circumstances attending the killing demonstrate an abandoned and malignant heart" and may also "be inferred from the use of a deadly weapon." *People v McMullan*, 284 Mich App 149, 153; 771 NW2d 810 (2009) (quotation marks, citations, and brackets omitted).

Involuntary manslaughter is the unintentional killing of another, i.e., a homicide "committed with a lesser mens rea of gross negligence or an intent to injure, and not malice . . . ." *People v Gillis*, 474 Mich 105, 138; 712 NW2d 419 (2006). "[T]he *sole element* distinguishing manslaughter and murder is malice." *People v Holtschlag*, 471 Mich 1, 10; 684 NW2d 730 (2004) (quotation marks and citation omitted).

Manslaughter is a necessarily included lesser offense of murder. *Yeager*, 511 Mich at 490. Therefore, "when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence." *Id*. (quotation marks and citation omitted). An instruction on involuntary manslaughter is merited only if a rational view of the evidence would support a finding that the victim's death was caused by gross negligence or an intent to injure that did not amount to malice. *Gillis*, 474 Mich at 138.

In the present case, a rational view of the evidence demonstrates that defendant acted with malice, meaning that the victim's death was not caused "by gross negligence or an intent to injure that did not amount to malice." *Id*. Specifically, defendant admitted to bringing a gun in the van, defendant was seen shooting that gun just before bringing it in the van, defendant was heard telling the victim that he was going to kill him, and defendant was seen shooting the victim in the head in very close proximity. The use of the gun alone supports an inference of malice. See *McMullan*, 284 Mich App at 153. Further, pointing a loaded deadly weapon at a person's head, while intoxicated, in a moving vehicle also supports an inference of malice because it demonstrates an "intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id*. Also, shooting a person in the head at close proximity demonstrates an intent to commit great bodily harm. See *id*. And expressing a desire to kill a person before shooting them also supports an inference of malice because it demonstrates an intent to kill, rather than an intent to injure. See *id*. Accordingly, a rational view of the evidence supports a finding of malice and precludes a finding of involuntary manslaughter.

Therefore, an involuntary manslaughter instruction was not merited in the present case. See *Gillis*, 474 Mich at 138. Accordingly, defense counsel was not deficient because he had no obligation to request an instruction that was not supported by sufficient evidence. *Geary*, ___ Mich App at ___; slip op at 3.

In addition, "[d]ecisions regarding what evidence to present . . . are presumed to be matters of trial strategy." *People v Dunigan*, 299 Mich App 579, 589-590; 831 NW2d 243 (2013). However, the failure to move for the suppression of evidence may constitute ineffective assistance of counsel if the evidence was inadmissible and its introduction was prejudicial. See *People v Abcumby-Blair*, 335 Mich App 210, 234-235; 966 NW2d 437 (2020). Further, "failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

As discussed earlier, the testimony regarding the knife incident and gun incident implicated MRE 404(b). Further, the prosecution failed to follow MRE 404(b) when it failed to provide the requisite notice of its intent to introduce the other-acts evidence at trial. Therefore, defense counsel was objectively deficient because he failed to object to the use of the other-acts evidence that was introduced without abiding by the MRE 404(b) notice requirement.

However, for the same reasons discussed earlier, this failure to object did not prejudice defendant. Specifically, if defense counsel objected, there would have then been a hearing on whether the other-acts evidence was admissible, and, as discussed earlier, it was substantively admissible. Therefore, the evidence would have been admitted regardless of defense counsel's objection. Further, for the same reasons discussed earlier, there was still overwhelming evidence of defendant's guilt notwithstanding the other-acts evidence such that a reasonable jury still would

-12-

have convicted defendant. Therefore, regardless of whether the evidence was included, the outcome of the proceeding likely would have remained the same.[6]

## C. PROPORTIONALITY OF SENTENCE

Lastly, defendant argues that the trial court abused its discretion because the sentence imposed, although within the guidelines range, violated the principle of proportionality. We disagree.

A trial court has the authority to sentence a defendant within the range of sentencing outcomes assigned by the Legislature for a given conviction. *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). The principle of proportionality requires a trial court's sentence "to be proportionate to the seriousness of the circumstances surrounding the offenses and the offender." *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). "An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *Boykin*, 510 Mich at 183. The trial court has a duty to exercise its discretion in a way that ensures a sentence is "tailored to the particular circumstances of the case and offender[.]" *Id*.

The statutory sentence for second-degree murder is "imprisonment . . . for life, or any term of years, in the discretion of the court trying the same." MCL 750.317. Because defendant's crime was committed in 1995, the legislative sentencing guidelines did not apply. See MCL 769.34(1) (The legislative sentencing guidelines apply to felonies committed on or after January 1, 1999.) Instead, the second edition of the judicial sentencing guidelines, which took effect on October 1, 1988, applied. See Administrative Order No. 1988-4, 430 Mich ci. The trial court determined that the judicial sentencing guidelines' range was 96 to 300 months (8 to 25 years). Thereafter, the trial court sentenced defendant to serve 25 to 50 years' imprisonment.

When *Milbourn* was decided, our Supreme Court opined that "the second edition of the sentencing guidelines is the best 'barometer' of where on the continuum from the least to the most threatening circumstances a given case falls." *Id*. at 656. But "even a sentence within the sentencing guidelines could be an abuse of discretion in unusual circumstances." *Id*. at 661. Accordingly, a sentence within the judicial guidelines was "presumed proportionate" in the absence of "unusual circumstances sufficient to overcome the presumption of proportionality." *People v Lyons*, 222 Mich App 319, 324; 564 NW2d 114 (1997).

---

[6] Courts should not conflate effective-assistance-of-counsel prejudice with plain-error prejudice. See *People v Randolph*, 502 Mich 1, 9-15; 917 NW2d 249 (2018). However, in the present case defendant has not provided any facts outside the lower court record that makes the prejudice analysis different. Further, the overarching question is the same—would the jury have reached a different verdict if it had not heard the other-acts evidence—and as discussed earlier, the answer is no.

Defendant does not dispute that his sentencing guidelines range was correctly calculated or that his sentence fell within the guidelines range. Therefore, defendant's sentence is presumed proportionate in the absence of unusual circumstances that rebut this presumption.

Defendant generally argues that because the trial court sentenced him at the top of the guidelines, it erroneously determined that he was "the most serious type of offender" and that the sentencing offense was "the most serious type of second-degree murder." See *Milbourn*, 435 Mich at 635. Defendant then makes the conclusory assertion that he is not the "most threatening type of offender" and that the offense was not the "most severe type of second-degree murder"; so, the 25-year sentence was disproportionate. The record provides no support for defendant's assertion and actually indicates quite the opposite, i.e., that defendant was the most serious type of offender and that the offense was the most severe type of second-degree murder.

The circumstances of the offense in the present case show defendant shot his best friend in the head, in close proximity, after telling him that he was going to kill him, and after the victim laughed, indicating his belief that defendant was not serious and would not shoot him. It is difficult to construe any of the circumstances of this offense as mitigating, and it was not unreasonable for the trial court to sentence defendant as though this offense was one of the most serious second-degree murder offenses. Defendant attempts to argue that the offense was a heartbreaking accident after a night of excessive drinking; therefore, the offense could not be the most serious type of second-degree murder. This is not an accurate or persuasive description of what occurred in this case.

First, the jury rejected any theory that the murder was an accident when it convicted defendant of second-degree murder. Second, the excessive drinking does not mitigate the circumstances of the offense; instead, as the trial court correctly stated, the drinking presented a serious concern because it demonstrated that defendant was prompted to shoot and kill his friend just because defendant was drinking. The circumstances of the offense demonstrate defendant *voluntarily* got drunk, obtained a gun, shot the gun several times, brought the gun into the van, told his friend that he was going to kill him, and then actually shot and killed his friend after his friend laughed, thereby expressing his belief that defendant was not serious and would not kill him. And then, after shooting and killing his friend—in front of four witnesses—defendant dumped the body, abandoned his family, fled to Mexico, and lived without consequences for over two decades. Again, the record does not demonstrate that circumstances before, during, or after the offense could be construed as mitigating in any way.

Defendant next argues that his personal circumstances do not suggest that he is the most serious type of offender. Specifically, defendant argues that his work ethic, remorse, and lack of a criminal record in Mexico following the murder of the victim, make him a "unique offender who should have been sentenced at the bottom of the range, not the top." An expression of remorse, however, is not sufficiently unusual to overcome the presumption of proportionality, especially in light of it being subjective and difficult to verify as genuine. See *People v Davis*, 250 Mich App 357, 369-370; 649 NW2d 94 (2002). See also *People v Daniel*, 462 Mich 1, 6; 609 NW2d 557 (2000) (noting remorse is a subjective factor that does not justify departure from a statutory mandatory minimum drug sentence). Regardless, the fact that defendant's only expression of remorse occurred 27 years after the offense more accurately supports the trial court's decision to sentence defendant at the top of the guidelines. Defendant only expressed remorse and took

responsibility after he was caught and convicted; he took no action in the two decades he was living free that indicated he was remorseful for his actions.

The trial court also specifically discussed how the imposed sentence comported with the sentencing considerations of punishment, protection, deterrence, and rehabilitation. See *Boykin*, 510 Mich at 183. The trial court emphasized punishment, noting that defendant likely never would have faced consequences had he not been found in Mexico and extradited. Further, it emphasized the loss that the victim's family endured, as evidenced by the victim's family's numerous victim-impact statements. The trial court also emphasized deterrence, noting its concern that defendant could shoot and kill another person if he decided to get drunk again because of how little it took for defendant to shoot and kill his friend. The trial court also explicitly rejected the potential for rehabilitation because defendant disappeared and took no accountability for over two decades.[7] Further, considering the fact that the victim's family was denied justice and closure for 27 years, a minimum sentence of 25 years was proportionate to the circumstances surrounding defendant and the offense.

In sum, the trial court specifically considered punishment, deterrence, protection, and defendant's rehabilitative potential. Further, the trial court specifically stated on the record its explanations for why a sentence at the top of the guidelines was proportionate to the circumstances of defendant and the offense. Accordingly, the trial court did not abuse its discretion and defendant has failed to overcome the presumption of proportionality, i.e., he has failed to demonstrate that the trial court abused its discretion by imposing a 25-year minimum sentence.

Affirmed.


/s/ Randy J. Wallace
/s/ Kathleen A. Feeney

---

[7] Defendant contends that the trial court should have considered the fact that he was not involved in criminal behavior while in Mexico, and therefore, had a high potential for rehabilitation. But defendant had incentive not to draw police attention to himself while in Mexico. Moreover, the prosecutor questioned the availability and accuracy of Mexican records. And although not prosecuted in Mexico, defendant's sentence memorandum reflects that he committed bigamy there, remarrying despite remaining married to his wife in Michigan. See Article 279 of the Federal Penal Code of Mexico (Bigamy is punishable by either 5 years' imprisonment or 180 to 360 days). And, as just discussed, the sentencing court gave no weight to defendant's rehabilitative potential due to his flight. Instead, the sentence imposed reflected the sentencing court's focus on protecting the public safety, punishment, and deterrence.